```
 1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF NEW YORK
 2

 3   ------------------------------X
                                   :
 4                                 :
     IN RE:                        :   14-MC-00041 (CLP)-GRB-RER)
 5                                 :
     HURRICANE SANDY CASES.        :
 6                                 :   June 15, 2015
                                   :   Brooklyn, New York
 7                                 :
     ------------------------------X
 8
          TRANSCRIPT OF CIVIL CAUSE FOR TELEPHONE CONFERENCE
 9       BEFORE THE HONORABLE CHERYL L. POLLAK, GARY R. BROWN
                       AND RAMON E. REYES, JR.
10                 UNITED STATES MAGISTRATE JUDGE

11   APPEARANCES:

12   For the Plaintiffs:         GREGORY F. COX, ESQ.
                                 MARK C. SPARKS, ESQ.
13                               CAROLINE L. MAIDA, ESQ.
                                 The Mostyn Law Firm
14                               3810 W Alabama Street
                                 Houston, Texas 77027
15
     For Standard Fire:          WYSTAN ACKERMAN, ESQ.
16                               FRANK F. COULOM, JR., ESQ.
                                 Robinson & Cole
17                               280 Trumbull Street
                                 Hartford, Connecticut 06103
18
                                 CRAIG R. BLACKMAN, ESQ.
19                               JANA M. LANDON, ESQ.
                                 Stradley Ronon
20                               2005 Market Street, Suite 2600
                                 Philadelphia, Pennsylvania 19103
21

22
     Court Transcriber:          MARY GRECO
23                               TypeWrite Word Processing Service
                                 211 N. Milton Road
24                               Saratoga Springs, New York 12866

25


     Proceedings recorded by electronic sound recording,
     transcript produced by transcription service
```

2

1  (Proceedings began at 11:04 a.m.)

2          THE CLERK:  This is In re Hurricane Sandy Cases,

3  docket number 14-MC-41, Civil Cause for Status Conference.

4  Attorneys, please state your appearances for the record.

5          MR. COX:  Yes, this is Greg Cox with the Mostyn Law

6  Firm appearing for the plaintiffs.  I'm joined by Mr. Sparks

7  from my office and also Ms. Maida from the Mostyn Law Firm.

8          THE COURT:  All right.  Good morning.

9          MR. ACKERMAN:  This is Wystan Ackerman with Robinson

10 and Cole for Standard Fire Insurance Company.  Also with me is

11 Frank Coulom from my firm and Craig Blackman and Jana Landon

12 from the Stradley Firm are on the line as well.

13         THE COURT:  Okay.  Good morning.  Anybody else?

14         Okay.  My law clerk has indicated that there might

15 be some issues with some of you hearing.  If that becomes a

16 problem, please let us know.  Okay?  Yes?

17         MR. ACKERMAN:  Okay.

18         MR. COX:  Yes.

19         THE COURT:  Okay.  The reason I asked for this

20 conference is to address some questions that have arisen in my

21 mind having now looked at the documents that Standard Fire

22 submitted for in camera review.

23         First of all, am I correct that these are not the

24 only documents that were withheld from plaintiffs in the

25 overall Standard Fire cases?  I think you submitted --

1          MR. ACKERMAN:  This is Wystan Ackerman.  That is

2     correct, Your Honor.

3          THE COURT:  Okay.  Because I think I got --

4          MR. ACKERMAN:  That is correct, Your Honor.  These

5     are three of the cases -- I'm sorry.

6          THE COURT:  Go ahead.

7          MR. ACKERMAN:  These are three of the cases against

8     Standard Fire.  The plaintiff had identified these three as

9     examples of redactions for purposes of the evidentiary hearing

10    that they wish to raise.  So we provided to the court for in

11    camera review documents that had been withheld in these three

12    cases.  I do have one clarification though to make which is

13    that in the Snead matter there actually was a supplemental

14    production that occurred on April 2nd in which nearly all of

15    what had been previously withheld was produced in that case.

16    So the only items that were listed on the privilege log that

17    ultimately was provided on I believe it was April 2nd in that

18    case where some reserve dollar amounts that were redacted but

19    the other materials were included in a supplemental

20    production.

21          THE COURT:  Okay.  But similar withholdings were

22    made in other Standard Fire cases, correct?

23          MR. ACKERMAN:  Yes.  My understanding is that the

24    Stradley Firm took a similar approach in the other case.

25          THE COURT:  Okay.  All right.  Now, without going

1  into any of the details of what is in these documents, they do

2  appear in large measure to be engineering reports which have

3  been redlined or blacklined, if you will, with additional

4  comments from someone other than the original engineer when he

5  wrote the report.  Am I accurate in that regard?

6         MR. ACKERMAN:  I do not think that's accurate, Your

7  Honor.  What I believe you may be referring to is there is an

8  independent adjusting report that was prepared post litigation

9  and the way that the independent adjusting firm did that work

10  was that they took the report that they had previously

11  prepared prior to the lawsuit and then they inserted in color,

12  in red, some additional information, additional comments that

13  they had on an estimate that was prepared [indiscernible]

14  Claims which was an adjusting firm retained by the plaintiffs

15  on the plaintiffs' side.  So they would provide Mr. Blackman

16  with sort of their commentary on the plaintiff's report that

17  they prepared.  They had an expert prepare it.  And Mr.

18  Blackman asked them to comment on that and then they would

19  then comment on that by -- the way they would do that was they

20  would take their prior report and then include some additional

21  content into it.  So that's I believe what Your Honor is

22  referring to there.  It was not an engineering report.

23         THE COURT:  Okay.  That was unclear to me when I

24  looked at them.  And there are a whole slew of attachments to

25  these adjusters' reports I guess is what they technically

5

1   should be called then.  All of these attachments were redacted

2   as well?

3          MR. ACKERMAN:  They were redacted as attachments to

4   the adjuster's report but they were produced as, you know,

5   self-standing documents.  You know, for example, in the

6   Bairity [Ph.] case the supplemental report attached to the US

7   forensics report there was the subject of the hearing and it

8   was produced in other productions of the case.  But the

9   approach that was taken when these documents were reviewed,

10  the Stradley Firm would, if it was holding basically or

11  redacting the report, there was post litigation.  They

12  redacted the full report including its attachments although

13  those attachments, if they were earlier created documents,

14  were produced separately as self standing documents.  And in

15  the Bairity, for example, all of those materials we've been

16  able to confirm that all of those attachments to that

17  independent adjusting report were produced as separate self

18  standing documents.

19         THE COURT:  Okay.  So I guess that means that all of

20  the photographs which are attached to the Bairity report,

21  which I think there are about it looks like 15 or so pages,

22  those were redacted but you're saying that they had already

23  been previously provided to plaintiff's counsel?

24         MR. ACKERMAN:  Yes.  In the Bairity case the

25  photographs that are part of what we provided to you at

6

1   SRSY289924 are included in a production with the Bates number

2   3PBAIJ24 through 38.

3          THE COURT:  And when the redacted documents were

4   provided and multiple pages such as these photographs were

5   withheld, was there a page saying redacted for each page

6   withheld or was it just one page for the entire document?  How

7   would they produced to the plaintiff I guess is really what

8   I'm trying to figure out.

9          MR. ACKERMAN:  Yes, Your Honor.  They were produced.

10  My understanding the way this was done in the production, and

11  I've seen this in a number of these cases, every page would be

12  marked redacted so if there was a 50 page report that was

13  withheld, plaintiffs would receive 50 pages of material with a

14  Bates number on it and nothing but the word redacted.

15         THE COURT:  Okay.  Yes.  I mean my law clerk points

16  out that, for example, the photographs that you just

17  mentioned, as I said I think there are about 15 pages of them,

18  they all have the exact same Bates number on it.  In fact, I

19  think the entire document has the same Bates number on it,

20  however many pages there are.  Why was it --

21         MR. ACKERMAN:  Yeah, the reason for that is -- my

22  understanding of the way Stradley's electronic system works is

23  when they initially load documents into their system what gets

24  assigned is a document number and that number is the same for

25  every page of the document.  And then when they produce

1  documents, they will apply traditional Bates numbers to them

2  at that point in time.  So the documents that were never

3  produced because they were redacted were sent to you in the

4  form that they were originally loaded into Stradley's system

5  which is why every page has the same -- every page of what

6  they consider a particular document has the same number on it.

7          THE COURT:  So I guess my question is how do we

8  confirm that in fact every photograph in here, which frankly I

9  don't think is privileged and shouldn't be withheld from

10  production, how do I know, there's no way to tell whether or

11  not the plaintiff actually received all 16 pages of these

12  photographs.  I mean normally they'd be one, two, three, four,

13  five, six, then you'd get one, two, three, four, five, six

14  pictures and you'd be able to tell.  But I guess I don't know

15  how the plaintiff verifies that they got everything that they

16  should have gotten when this entire package was withheld under

17  one Bates number.

18          MR. ACKERMAN:  I mean unless we provide both sets of

19  photographs to the plaintiffs, I'm not sure how they can

20  confirm.  I'm not sure we want to trouble the court with doing

21  that.  I don't think that my client cares about the photograph

22  to such an extent that we would want to trouble you with that.

23  So I think if the court would like us to produce all of those

24  photographs that fall within the scope of this, I would be

25  confident my client would be fine with doing that.

8

1          THE COURT:  I mean pretty much everything attached

2    to the actual report itself redlined document including the

3    plaintiff's own proof of loss, I mean other things in here,

4    letters from the Gauthier firm -- I mean all of this seems to

5    me to be stuff that under normal circumstances would not be

6    withheld except for the fact that it's attached to the expert

7    report.  Am I correct?  Is that what you've done here?

8          MR. ACKERMAN:  That is correct, Your Honor, and we

9    have confirmed that in the case of Bairity all of those

10   attachments have been produced in separate productions.

11         THE COURT:  What about the other --

12         MR. ACKERMAN:  But if it would make it easier we'd

13   be happy to disclose them.

14         THE COURT:  Okay.  And I guess then the other

15   question is you explained what happened in Bairity, that Mr.

16   Blackman gave the plaintiff adjuster's report I guess from

17   Canopy Claims I think to its own adjuster.  He redlined it

18   with additional commentary.  Is that what happened in every

19   single one of these cases, all of the standard filed cases?

20         MR. ACKERMAN:  I'm not sure, Your Honor, we can make

21   a blanket statement as to how this was done in every single

22   instance.  There are an awful lot of cases here.  But my

23   understanding is that Mr. Blackman's approach generally

24   speaking was when he got an adjusting report from the

25   plaintiff's side, he would send that to either the same

1  adjuster that had handled the matter prior to litigation, or

2  if that person was not available for some reason, to another

3  independent adjuster to look at and provide comments to Mr.

4  Blackman.  Similarly, where there was an engineering report

5  that was prepared by an engineer working on the plaintiff's

6  side, it was provided in the course of litigation or shortly

7  before litigation.  Then Mr. Blackman would provide that to,

8  again, an engineer to look at and provide him with commentary

9  on it and if necessary, do another inspection.  But exactly

10  how it went down would depend on the particular circumstances

11  involved.

12          THE COURT:  I guess what troubles me is that, you

13  know, all of this was done in the context I'm assuming of this

14  special procedure that Standard Fire set up in lieu of the

15  court ordered mediation.  And I didn't supervise the Standard

16  Fire proceeding, but I have spoken to Judge Reyes and

17  confirmed that it was his understanding, and he operated the

18  same way I did with the companies that I handled, Allstate and

19  American Bankers, which was when I authorized them to go out

20  and reinspect the home to deal with these engineering or

21  basement issues, the understanding was that whatever was

22  produced would be provided to plaintiff's counsel.  Now I take

23  it from what Mr. Blackman did here, that's not what happened.

24  Am I correct or am I misreading the situation?

25          MR. ACKERMAN:  I believe that's incorrect, Your

10

1    Honor.  I can defer to Mr. Blackman if you'd like.

2              MR. BLACKMAN:  Yeah, Your Honor, your understanding

3    is a bit more limited than the circumstances.  At first, I

4    just want to add it wasn't simply based upon proofs of loss or

5    -- there were multiple circumstances where I was directing

6    adjusters to review supplemental data for purposes of telling

7    us -- evaluating -- for us to evaluate the merits of the

8    plaintiff's claims as we were trying to move these into

9    resolution.  So it could be circumstances like you see here

10   where supplemental proofs and documentation were submitted.

11   There could be a circumstance as you see here where we've got

12   a plaintiff's engineer's report and I wanted to have the

13   independent engineer review that data and tell us whether

14   there was anything new documented in the plaintiff's report

15   that would change their prior conclusion.  Your Honor would

16   also recall that, I forget which DMO it was, but there was a

17   requirement that the plaintiffs provide all of their actual

18   receipts and invoices.  We were getting reams of data from

19   plaintiffs and now they're stating that circumstance.  And I

20   was also sending all of those documents to adjusters to tell

21   us what they disclosed, what more might be payable, what

22   documentation was missing.  And all of this, by the way, long

23   predated the initiation of the IAPA process which didn't come

24   about until spring or early summer.  We were initiating these

25   global on going evaluation steps from the very outset of the

1   filing of these cases.  So there's a long period of time in

2   which this data is being developed prior to the IAPA process

3   separate and independent from it.  The interplay of the IAPA

4   process is that for settlement discussion purposes as we got

5   into each matter as they rescheduled, the readjustment data

6   was then shared with plaintiff's counsel and their adjuster in

7   this settlement conference context so that they could see what

8   our evaluation was of the supplemental materials as we worked

9   through a line by line review during the IAPA process.  So

10  where you see documents here like the supplemental reports in

11  Nevins, for example, if we had gotten Nevins into an IAPA

12  process, our engineer's evaluation of the plaintiff's

13  engineering report would have been presented and discussed in

14  the settlement discussion.  It would not have been produced as

15  a litigation document.

16          THE COURT:  Okay.  I guess I just don't understand

17  then why they were withheld at all because this is one of the

18  issues that came up in the mediation where lawyers were

19  showing up at the mediation and for the first time providing

20  the other side with a report that they had never seen and

21  relying on that report to discuss mediation.  So if you were

22  turning them over anyway, I don't understand why they weren't

23  withheld in the first place.  And I guess I'm still unclear.

24  It sounded from the testimony before me there was still a lot

25  of these documents that had never been disclosed to the

12

1  counsel for the plaintiffs in specific cases.  Am I right

2  about that?

3          MR. BLACKMAN:  You are.  There were a -- recall, the

4  IAPA process got pulled to a halt in February, Your Honor.

5  There were many, many cases that never got to the IAPA process

6  because the FEMA settlement process resulted.  In those cases,

7  we provided all of those documents to FEMA for their use to

8  present the plaintiffs in the settlement discussion.  We did

9  not ever produce these materials at the last minute at the

10  IAPA conference as a surprise as Brian O'Cally [Ph.] would no

11  doubt testify.  As we went into each round we provided them

12  with copies of the materials regarding the matters in that

13  round so that when we met we were having immediate and

14  constructive discussions.  And Mr. O'Cally and their adjuster

15  were both repeatedly and devotedly extremely pleased with how

16  that process was handled because it was done in an

17  extraordinarily constructive manner.  We weren't showing up at

18  these conferences trying to blind sight them as they will

19  certainly testify.  My job was to find whatever sources of

20  supplemental payments within the program could be made and to

21  get a FEMA waiver or concurrence where necessary.  So we

22  weren't showing up at IAPA conferences and dropping stuff in

23  their laps saying sorry, this isn't payable.  As we went into

24  each round, we would cooperatively work to identify, for

25  example, the ones where we knew there was a substantial

13

1    payment that could be made, the low hanging fruit so to speak,

2    so that -- and provide them with the material and our

3    evaluation in advance of sitting down so that when everybody

4    sat down we were immediately going line by line to see if

5    anything had been missed.

6              THE COURT:  Okay.  Well, it was just something you

7    had said like two minutes ago that led me to believe that you

8    were withholding them until the actual meeting.  So I

9    apologize if I misunderstood what you were saying.  But I

10   gather now from what you've just said that when the IAPA

11   process halted because of FEMA's involvement, you turned over

12   all of these documents that contained additional analyses, if

13   you will, of either the plaintiff's adjuster's report to the

14   plaintiff's engineers or the receipts, et cetera.  All of that

15   has been disclosed to FEMA.  Is that what I just heard you

16   say?

17             MR. BLACKMAN:  The manner where any -- I'm sorry.

18             THE COURT:  Go ahead.

19             MR. BLACKMAN:  In the manner where any such

20   supplemental reports were made clear, for example, this is

21   your starting point.  Just to pull a number out of thin air,

22   they provided us with receipts and invoices.  There's an

23   additional $25,000 that's payable here.  Here is the report

24   and evaluation.  When we sent the files over to FEMA this

25   should be your starting point for your negotiations.  You

14

1   don't need to recreate this.

2          THE COURT:  Okay.  So in I guess it's Snead, Snead

3   is one that I got, it looks like it's not just comments on an

4   old report but an entirely new report.  Am I wrong about that?

5          MR. ACKERMAN:  That is correct, Your Honor.  That

6   one is one that has been produced.  Although it was initially

7   withheld, it was produced in April, I believe the date is

8   April 2nd.

9          THE COURT:  Okay.

10          MR. BLACKMAN:  And again, Your Honor, if you put it

11   in context, the Snead was a basement survey and this was

12   before the court's order requiring the plaintiffs to identify

13   any properties in which they believed a basement had been

14   improperly designated.  So before we got to give them the

15   survey confirming that it was a basement because we didn't get

16   to a Snead discussion, the [indiscernible] firm had already

17   withdrawn the contention that Snead was not subject to a

18   basement limitation.  And so that was one of the reasons that

19   even though we never got to Snead, we didn't produce that

20   because it was mooted.

21          THE COURT:  Okay.  All right.  And I guess my final

22   question then is has there been a privilege log provided to

23   the plaintiffs with respect to reports that continue to this

24   day to have been withheld from them?

25          MR. ACKERMAN:  Your Honor, in the Snead case there

15

1   was a privilege log that was provided when the supplemental

2   production was made.  In the other two cases, there was no

3   privilege log created and provided prior to the evidentiary

4   hearing and we did submit the declaration of Craig Blackman

5   which provided much more detail I think than typically a

6   privilege log would.  But that was the thinking there.

7           In cases that had settled, meaning FEMA had reported

8   this case as settled, and where no plaintiffs had raised any

9   issues with respect to redaction given that the case had

10  settled, they reached a settlement, Stradley did not continue

11  to prepare privilege logs in those settled cases.

12          THE COURT:  Did you provide Mr. Blackman's affidavit

13  to plaintiff's counsel or just to me?

14          MR. ACKERMAN:  Yes.  That was filed in the record

15  with Mr. Goldman's letter.  It was filed publicly.

16          THE COURT:  Okay.  All right.  Mr. Cox, Mr. Sparks,

17  Ms. Maida, do you have any questions?  I have a better

18  understanding of what this is --

19          MR. COX:  Well, this is --

20          THE COURT:  -- but -- go ahead.

21          MR. COX:  Yes, Your Honor.  This is Greg Cox on

22  behalf of the plaintiffs.  Based on the affidavit and what I'm

23  hearing today, I do have a better understanding about these

24  specific cases.  The one thing that I didn't hear is that

25  there was independent confirmation that the documents such as

1  the attachments that were referenced, although they say that

2  they were all produced independently in Bairity, I don't know

3  if that's the case in other files.  I don't know the extent

4  that they have gone back to try to figure out if those

5  documents being withheld were actually independently produced

6  including the photographs and the other underlying information

7  that might be attached to those reports.  I'm somewhat

8  laboring in the dark here because I have not seen the

9  documents and I really probably could speak as intelligently

10 about them as Your Honor could having seen them.  But that

11 would be one of my primary concerns is if there's some sort of

12 independent verification by Stradley or whomever that in fact

13 the underlying data and the photographs and the factual

14 information has been independently produced in all the cases.

15        THE COURT:  Do you concede that the redlined

16 reports, the reports for example where Mr. Blackman took the

17 Canopy claims adjuster's report, gave it to his own adjuster

18 and the defendant's adjuster then added his or her own

19 comments regarding what was in the Canopy claims estimate?

20 Are you conceding or willing to concede that that is protected

21 work product and was properly withheld, and that so long as we

22 get a verification from Standard Fire that all of the other

23 exhibits and attachments such as photographs were

24 independently produced that we have no problems here?

25        MR. COX:  Well, in that circumstance I think we

1  would concede that it's privileged if it was done at the

2  direction of counsel and not at the direction of, you know,

3  the client itself.  I guess a lot of -- my concern is that

4  some of it may just be coincidental timing because, for

5  instance, if the carrier was going to send an adjuster out and

6  the adjuster just happened to go back out after a lawsuit was

7  filed, I don't think that would make it privileged.  But if

8  Mr. Blackman is saying that after suits were filed he's the

9  one directing that these pre-analysis or readjustments take

10  place and that they are reporting to him, then I think in

11  those circumstances we would concede that that would be work

12  product.  I just don't know in all the circumstances if that's

13  exactly what happened.  But here if that's the case then I

14  think we're satisfied with that.

15         MR. BLACKMAN:  Your question, Your Honor -- it's

16  Craig Blackman.  Standard Fire's operating practice through

17  NFS is that upon notice of the filing of a lawsuit all

18  [inaudible] are dropped.  No further adjustments or

19  inspections take place.  I gave a specific instruction on

20  behalf of Standard Fire when we saw the wave of litigation

21  that was coming in and Standard Fire's interest in getting

22  these evaluated for resolution as swiftly as possible.  I gave

23  a specific instruction that the standard practice should be

24  put by the wayside and that I personally wanted all

25  supplemental data to be adjusted, reviewed, and reported so

1   that we could put these cases into settlement posture as

2   quickly as possible.  The only reason there is any post

3   litigation evaluation going on in the Standard Fire cases was

4   because of that direction.

5          THE COURT:  Okay.  And how do we verify -- this is a

6   question, I don't really know the answer, that in fact in all

7   of the Standard Fire cases where the supplemental reports were

8   prepared that the underlying pre-litigation documentation

9   where things such as photographs were in fact provided to the

10  plaintiff, how can I be assured of that?  Again, this method

11  of Bates stamping makes it more complicated.  Otherwise I

12  would just have you check.  But we can't really do that now

13  can we?

14         MR. ACKERMAN:  Well, Your Honor, this is Wystan

15  Ackerman.  That was a process that Stradley was engaged in at

16  our client's direction in terms of going back through and

17  making sure that redactions were appropriate in that respect

18  and any other respect.  Now, they have done that in a number

19  of cases.  There's been a lot of cases that are settled as

20  well where the clients' lawyers didn't raise any issue about

21  it before they -- I mean they were aware of the redactions.

22  Obviously they got page after page of redacted material and

23  then they settled the case.  So I think in the cases that

24  remain open we're happy to continue that process and turn over

25  the attachments.  But to go back through and do it in cases

1    that are, you know, fully and finally settled or cases where

2    the plaintiffs' lawyers agreed to a settlement without raising

3    any concern about the redactions would seem to be unnecessary.

4              THE COURT:  How long would it take --

5              MR. BLACKMAN:  If I may add, Your Honor, just the

6    nature of the tasks, this was data that was coming from the

7    plaintiffs that I was having reviewed and evaluated so that

8    even if there were some circumstance where, and I have no

9    particular circumstance in mind, but if there were some

10   circumstance where particular documents provided to us by

11   plaintiffs had not been produced back to them such as, for

12   example, their billing receipts and invoices, the material

13   that I was having reviewed was material that was coming from

14   and on behalf of plaintiffs in the first place.  That was the

15   nature of these reexaminations and reviews.  It wasn't any

16   independent go out and tell me what you find.  It was a

17   response to what was being provided to us.  What we now have

18   from plaintiffs is how much more is payable or what do we

19   need.

20             THE COURT:  Well, I mean I guess, Mr. Blackman, with

21   all due respect, I'm looking at the Snead case, for example,

22   and there is a report here from an entity called Demaro

23   Engineering which seems to be not a plaintiff engineer,

24   although I'm not sure.  And it's unclear to me whether or not

25   the photographs attached to this gentleman's report were taken

1   by plaintiff's engineer or plaintiff's adjuster, or someone

2   hired by Standard Fire.  That's why I'm saying I don't have

3   any reason to disbelieve you but there's nothing in the

4   documents themselves that indicate that in fact these

5   documents were prepared or were photographs taken by plaintiff

6   agents and not someone -- in fact, some of these seem to have

7   been taken by United Technical Consultants.  Was that

8   plaintiff's expert what was that a defendant's expert?

9           MR. BLACKMAN:  UTC, Your Honor, and Steven Bonjorno

10  [Ph.] were the independent engineers that we retained.  What

11  they were reviewing was the plaintiff's report.

12          THE COURT:  Okay.

13          MR. COX:  And to be clear, the photographs in the

14  Snead case were produced, my understanding, those were

15  produced in April as part of the supplemental review and

16  production process, and that is a process that Standard Fire

17  is happy to continue and complete in cases that remain open on

18  the court's docket.

19          THE COURT:  Right.  But --

20          MR. COX:  And that will ensure that any attachments

21  to these types of reports get produced in open cases.

22          THE COURT:  Okay.  I appreciate that, but I guess my

23  question is these images, were they images provided to

24  Standard Fire by their own expert or by plaintiff's expert?

25          MR. COX:  I believe that the images in the Snead

1  file were taken by the company that was asked post litigation

2  by Mr. Blackman to do a basement survey, so they went out to

3  determine whether or not the lower level of that home was a

4  basement under FEMA guidelines and they took a number of

5  photographs in the course of that work.  So I believe that was

6  the reason for those photographs in the Snead case.

7       THE COURT:  Exactly.  And so those are not documents

8  that would have had to be reproduced back to the plaintiffs

9  because they came from plaintiffs in the first place.  These

10 were documents prepared in the first instance by someone

11 working for Standard Fire.  And it's these very kind of

12 documents that I want to make sure have actually been provided

13 to the plaintiffs, you know, in the open cases certainly.  And

14 I guess I would ask plaintiff's counsel if they have any

15 reason to request reopening the other cases to see this stuff

16 or not, or should we just have Standard Fire go forward and do

17 as counsel has suggested and just double check and make sure

18 all this stuff has been provided that's not, you know, true

19 work product.

20      MR. COX:  Your Honor, this is Greg Cox.  I'm a

21 little hesitant to speak on behalf of other plaintiff counsel

22 that may not be party to this.  And I'm sure there been a

23 number of cases that have settled.  And my only worry is that

24 they were settled on imperfect information.  You know, a

25 hypothetical that pops into my head is this basement survey.

22

 1  I know that was a big issue having to do with the coverages.

 2  It was sort of an ongoing contention between the plaintiffs

 3  and the defendants and there was, you know, I guess it's a

 4  factual dispute below grade, you know, et cetera, et cetera.

 5  And my only concern would be if, you know, there was a

 6  photograph or some factual information that was gathered by

 7  defendants and not provided, you know, whether they gave it to

 8  FEMA or not.  I don't know.  I can't say that I have seen all

 9  the productions and if FEMA even forwarded this information on

10  for these settlement conferences.  But if there was some

11  factual information that might actually have contradicted the

12  defendant's position and if a case was settled based on an

13  incorrect understanding of the facts, I'm hesitant to say well

14  no harm no foul.  I just don't know.

15          THE COURT:  All right.  Well here's --

16          MR. COX:  I don't know how we're even going to

17  figure that out.

18          THE COURT:  Yes, I don't know either.  I mean here's

19  what I'm going to say.

20          MR. BLACKMAN:  If I may, Your Honor, first of all I

21  completely agree with Mr. Cox that if we had -- if there had

22  been an adjustment that said it was a basement and we did a

23  survey that said that it wasn't a basement, that absolutely

24  would have been disclosed to the plaintiffs regardless of

25  whether they had withdrawn their contention that it wasn't a

23

1   basement and there would have been an immediate readjustment.

2   I have at least one of those cases where that's precisely what

3   happened.  But I want to remind you that in Snead, that's not

4   what happened.  We'd be happy to provide the documents.  But

5   as I said, this was mooted, the basement issue was mooted as

6   to the [indiscernible] matters.  They withdrew their

7   objections as to any of the Standard Fire matters that had

8   been adjusted in the basement in response to DMO orders

9   requiring them to undertake surveys for any disputed

10  properties.  Snead was not listed.  The contention that it

11  might not be a basement was effectively withdrawn and this

12  issue mooted which is why we didn't bother to send them the

13  report and the photographs.

14          THE COURT:  Okay.  Well, I'm not so much concerned

15  about Snead as I am the other Standard Fire cases for which I

16  haven't seen the documents.  And I guess I would say that it

17  weren't for the problem that developed with an engineering

18  report in the other case that got missed or put in the wrong

19  pile or however you want to describe it, I would be

20  comfortable saying well okay, it sounds like everything was

21  working according to the process.  But I think what I'm going

22  to do is I'm going to order Standard Fire to go back and

23  verify for all of the open cases, the ones that have not

24  settled, that in fact all of the non-privileged, non-work

25  product documents as we've described them here today have in

1  fact been provided to plaintiff's counsel so that going

2  forward any discussions of settlement will be, you know,

3  handled with all available information.  I'm not sure what I

4  am thinking about with respect to the settled [indiscernible]

5  cases but let's at least proceed so that we can continue to

6  move forward on the ones that haven't settled yet.  Let's get

7  a verification.  Can we do that in the next week?

8          MR. COX:  I think -- I mean Stradley is indicating

9  they believe they can do it within seven days but we'd ask for

10  14 days I think just to make sure we have enough time for

11  that.

12          THE COURT:  Okay.

13          MR. COX:  If that's all right.

14          THE COURT:  That's fine.

15          MR. ACKERMAN:  And just for purposes of

16  clarification, there are a substantial number of cases that

17  are administratively closed on the docket because I guess they

18  would term a tentative settlement has been reached between

19  Mostyn and FEMA.  As to those cases, are we considering them

20  not part of this process or are they part of this process?

21          THE COURT:  Well, the problem with the tentatively

22  settled cases is that they were, and then as you all know,

23  there was a problem that developed with representations made

24  by FEMA that could not be followed through on.  And so the

25  last time I looked, we really only had maybe 50 or so cases

1   that had actually settled, that people actually agreed to take

2   the FEMA numbers.  So I'm not sure that the fact that a case

3   is administratively closed or was administratively closed

4   several months ago means that they actually have agreed to the

5   settlement.  It's my understanding that some of those cases

6   are being revisited but maybe, Mr. Cox, you can tell me if I'm

7   wrong on that score.

8          MR. COX:  I don't disagree with the court's

9   understanding.  I think there's been a lot of, you know, back

10  and forth on some of these cases.  So I would ask that those

11  cases not be considered closed or settled because at best it's

12  only tentative at this point.  If there is information, if I

13  move the needle one way or the other on getting the case to a

14  different resolution, I think we need it.

15         THE COURT:  Okay.  All right.  So I would consider

16  those administratively closed cases unless the plaintiff has

17  signed a release and everything is done, then I would consider

18  those cases to be ones where I just want to know that you've

19  actually turned over everything.  Okay?

20         MR. ACKERMAN:  Okay.  We understand, Your Honor.

21         THE COURT:  Okay.  All right.  Mr. Cox, anything

22  else?

23         MR. COX:  No, Your Honor.  Thank you for your time.

24         THE COURT:  Okay.  Thank you all.

25         MR. ACKERMAN:  Your Honor, if I could, this is

1    Wystan Ackerman.  We would also on behalf of Standard Fire

2    like to have a settlement discussion.  I think in particular

3    with respect to the Cannon matter, but it may lead to

4    something broader.  I'm not sure if Your Honor is comfortable

5    with conducting that given your role in the hearing and all or

6    if we should reach out to Judge Reyes, but Standard Fire would

7    like to have such a conference.

8               THE COURT:  Let me speak to Judge Reyes and Judge

9    Brown.  I'm going to be out for the rest of the week, but

10   maybe it would make sense for him to do it if he has the time.

11   I believe he's on trial this week so it may not be convenient

12   for him.  But we will discuss it.  One or the other of us will

13   get back and schedule something.  Okay?

14              MR. ACKERMAN:  Thank you, Your Honor.

15              MR. BLACKMAN:  Thank you, Your Honor.

16              THE COURT:  All right.  Thank you.

17              MR. COX:  Thank you.

18              THE COURT:  Bye-bye now.

19   (Proceedings concluded at 11:48 a.m.)

20                      *  *  *  *  *  *

21

22

23

24

25

27

1        I certify that the foregoing is a court transcript from

2   an electronic sound recording of the proceedings in the above-

3   entitled matter.

4

5   _____

6                                    Mary Greco

7   Dated:   July 7, 2015