UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------

PIETRO GIAMBRONE and BRIGID
GIAMBRONE,

                 Plaintiffs,

        v.

MERITPLAN INSURANCE COMPANY,

                 Defendant.

**MEMORANDUM & ORDER**
13-CV-7377 (MKB)

-------------------------------------------------------------

MARGO K. BRODIE, United States District Judge:

Plaintiffs Pietro Giambrone and Brigid Giambrone commenced the above-captioned

action on October 24, 2013, against Defendant Meritplan Insurance Company ("Meritplan") in

the Supreme Court of the State of New York, County of Richmond. On December 27, 2013,

Defendant removed the action to this Court. Plaintiffs alleged breach of contract and breach of

the duty of good faith and fair dealing, arising from a dispute over whether an insurance policy

issued by Defendant covers alleged damage to Plaintiffs' property arising from Hurricane Sandy

("Sandy").[1] Additionally, Plaintiffs sought a declaratory judgment that the terms of their

insurance policy obligate Defendant to pay for the property damage alleged by Plaintiffs. On

September 18, 2014, the parties stipulated to dismissal of all claims except Plaintiffs' breach of

contract claim, on which Plaintiffs seek compensatory damages. (Docket Entry No. 67.) On

---

[1] Sandy originated as a late-season tropical hurricane in the Caribbean Sea, and made landfall in the northeastern United States as a post-tropical cyclone. (*See* NOAA Hurricane Center, AL182012, Tropical Cyclone Report: Hurricane Sandy 1 (2013), *available at* http://www.nhc.noaa.gov/data/tcr/AL182012_Sandy.pdf.) In late October 2012, Sandy caused storm surge across the coastlines in New Jersey and New York, and resulted in strong winds, heavy rains and freshwater floods. (*Id.* at 1 n.2, 4.)

November 26, Defendant moved to disqualify Plaintiffs' counsel, Verne Pedro, and his law firm, Ellis, Ged & Bodden P.A. ("EGB"), as conflicted. The Court heard oral argument on July 1, 2015, and denied Defendant's motion to disqualify Mr. Pedro and EGB from representing Plaintiffs in this action. The Court explains its decision below.

## I. Background

### a. The Insurance Policy, claim and denial

In the action presently before the Court, Plaintiffs are represented by Verne A. Pedro, an associate at EGB. Defendant is represented by Joanna M. Roberto and Clayton D. Waterman of the law firm Goldberg Segalla LLP ("Goldberg Segalla").

Plaintiffs allege the following facts in their Complaint. Plaintiffs were issued a standard-form homeowner's insurance policy by Defendant, bearing policy number 60430002, which was effective beginning on May 12, 2012 and ending on May 15, 2013 (the "Insurance Policy").[2] (Compl. ¶ 1, annexed to Not. of Removal as Ex. 2, Docket Entry 1-2.) Plaintiffs' home, located at 171 Androvette Avenue in Staten Island, New York (the "Property"), suffered "extensive damage" from wind-driven rain during Sandy. (*Id.* ¶ 3.) At the time of the storm, the Property was insured under the Insurance Policy which covered, among other things, injury to, destruction of, or loss of use of the Property resulting from wind and wind-driven rain. (*Id.* ¶¶ 7, 13–14.) Plaintiffs submitted a property damage claim under the Insurance Policy to Defendant, seeking

_____

[2] The Declaration of Joanna Roberto submitted in support of the Defendant's motion to disqualify Plaintiffs' counsel indicates that the Insurance Policy, underwritten by Meritplan, was actually issued to Plaintiffs' home mortgage lender, GMAC Mortgage, LLC. (Decl. of Joanna M. Roberto in Support of Mot to Disqualify Pls. Counsel, annexed to Def. Mem. as Ex. C ("Roberto Decl.") ¶ 3.) The Insurance Policy provides coverage for Plaintiffs' residential location, is titled "Lenders-Placed Insurance," and provides the mortgage lender with protection for its financial interest in the Property. (*Id.*) Defendant does not, at this time, challenge Plaintiffs' standing to bring this claim.

payment for damage resulting from the storm.[3]  (*Id.* ¶ 16.)  Defendant denied Plaintiffs' claim, citing a provision in the Insurance Policy excluding flood damage from coverage under the Insurance Policy.  (*Id.* ¶ 17.)  Plaintiffs allege that the damage to the Property caused by wind and wind-driven rain is separable from any flood damage to the Property, and thus covered by the Insurance Policy.  (*Id.* ¶¶ 3, 18–19.)  Plaintiffs contend that Defendant failed to investigate their insurance claim and adjust the claim properly, and has denied coverage without a reasonable basis for doing so.  (*Id.* ¶¶ 20–21, 23.)

Plaintiffs initially sought a declaration that (1) the Property was damaged as a result of wind or wind-driven rain; (2) the damage is therefore covered under the Insurance Policy; (3) the Insurance Policy is "triggered based on the date on which the damage occurred;" and (4) Plaintiffs are entitled to coverage, damages, and other relief as a result of Defendant's breach of the Insurance Policy and breach of the duty of good faith and fair dealing.  (*Id.* ¶ 5.)  Plaintiffs now seek only compensatory damages for breach of the Insurance Policy.  (Docket Entry No. 67.)

### a.    The relationship between Defendant and QBE entities

Currently, Defendant's insurance policies are owned and handled by QBE Insurance Group Ltd. and "QBE subsidiaries."  (Decl. of Joanna M. Roberto in Support of Mot. to Disqualify Pls.' Counsel, annexed to Def. Mem. as Ex. C ("Roberto Decl.") ¶ 2.)  QBE Insurance Corporation reinsures all policies underwritten by Meritplan and, in doing so, it "assumes all

---

[3]  Shortly before the storm, in April 2012, the Property suffered significant damages from a fire.  (*See* Pedro Letter dated Oct. 2, 2014, annexed to Def. Mem as Ex. F, 1–2.)  According to a letter from Plaintiffs' counsel, before Plaintiffs could repair the property, Sandy damaged it further.  (*Id.* at 1.)  Plaintiffs have retained separate counsel as to the fire damage claim, and provide no additional information as to the status of that claim.  (*Id.*)

assets, liabilities and risks arising out of coverage under the Meritplan policies." (Def. September 2014 Letter 1, Docket Entry No. 69.) At oral argument, counsel for Defendant further explained that QBE Insurance Corporation reinsures all Meritplan-issued policies, but maintains the policies under the Meritplan name. In June 2011, QBE Americas, Inc. ("QBEAI") became the third-party claims administrator for Defendant. (Decl. of Kenneth Davidson[4] in Support of Mot. to Disqualify Pls. Counsel, annexed to Def. Mem. as Ex. B ("Davidson Decl.") ¶ 2.) As third-party administrator, QBEAI "supervises and manages all aspects of claims for several QBE insurers, affiliates and policies underwritten by other carriers . . . including claims for Meritplan." (Supp. Decl. of Kenneth Davidson in Further Support of Mot. to Disqualify ("Supp. Davidson Decl.") ¶ 3, Docket Entry No. 120-2.) An affiliate of QBEAI, QBE FIRST Insurance Agency, Inc. ("QBE FIRST") became program manager for Defendant. (Davidson Decl. ¶ 2.) Together, QBEAI and QBE FIRST "assumed responsibilities and complete oversight for claims management and administration, adjusting, coverage and litigation management for Meritplan [insurance] policies." (*Id.*) Meritplan has no independent duties with respect to handling the claims and litigation related to its insurance policies; "QBEAI manages the claims and the litigation strategies employed." (Supp. Davidson Decl. ¶ 6.) Claims response and litigation strategies are determined by the same panel of counsel for Meritplan and other QBE-affiliates' insurance policies, and the panel of counsel tends to use uniform claims, coverage and litigation strategies across policies. (*Id.* ¶¶ 7–8.)

The Insurance Policy — at issue in this litigation — was underwritten by Meritplan and issued to Plaintiffs' home mortgage lender, GMAC Mortgage, LLC. (Roberto Decl. ¶ 3; Ans.

---

[4] Kenneth Davisdon is the Assistance Vice President, Senior Claims Manager for QBEAI. (Davidson Decl. ¶ 1.)

¶¶ 24–25.) QBEAI and QBE FIRST have "at all times managed and assumed responsibility for all aspects of the [Plaintiffs' Insurance] Policy, including the receipt of premiums and the administrations of claims submitted under the [Insurance] Policy." (Davidson Decl. ¶ 5.) The legal department for QBEAI and QBE FIRST works in conjunction with Goldberg Segalla to oversee the litigation in this action, "and remains responsible for any and all liabilities under the [Insurance] Policy." (*Id.*; Supp. Davidson Decl. ¶ 9.) Defendant contends that there is "one North American claims department which administers claims including litigations for QBE and non-QBE insurers which includes Meritplan." (Def. Supp. Brief in Supp. of Mot. to Dismiss 3.) As counsel explained at oral argument, the same individuals frequently handle all of the legal claims for insurance policies issued by both QBE and non-QBE insurers and administrated and managed by QBEAI and QBE FIRST.

### b. Mr. Pedro's former employment at Goldberg Segalla

From November 1, 2010 through March 22, 2013, Mr. Pedro was employed as Special Counsel in Goldberg Segalla's Global Insurance Services practice group. (Roberto Decl. ¶ 4; Aff. of Verne A. Pedro in Supp. of Pls.' Opp'n to Def. Mot. to Disqualify, annexed to Pl. Opp'n ("Pedro Aff.") ¶ 3.) As Special Counsel, Mr. Pedro's legal practice included advising insurers on policy interpretation, analyzing the applicability of case law to the insurance policies at issue in light of the factual circumstances of a particular case, drafting opinions relating to insurance coverage, and handling litigation matters relating to insurance. (Pedro Aff. ¶ 9.) Mr. Pedro provided legal representation to "QBE and its related insurance companies,"[5] on matters

---

[5] Roberto refers to QBE Insurance Group Ltd. and other QBE subsidiaries collectively as "QBE." (Roberto Decl. ¶ 2.) At oral argument, counsel clarified that QBE Holding Company is the parent corporation of a number of QBE affiliates, including QBE Insurance Corp., which is the parent company of QBE FIRST and QBEAI. QBE Insurance Corp. reinsures Meritplan

concerning insurance coverage. (Roberto Decl. ¶ 5; Pedro Aff. ¶ 9.) One of Mr. Pedro's clients may have been "QBE Specialty." (Pedro Aff. ¶ 14.) Neither party elaborates on the relationship of QBE Specialty to the other QBE-related entities or to Defendant.

Mr. Pedro was assigned certain QBE matters, or "files," for which he was primarily responsible until the matter was resolved. (Roberto Decl. ¶ 7.) Mr. Pedro's responsibilities on the QBE matters included drafting "coverage opinions correspondences," communicating directly with QBE claims handlers and QBE management personnel, and representing QBE in litigation related to insurance coverage.[6] (*Id.* ¶ 6.) According to Defendant, "Mr. Pedro's day-to-day responsibilities required having access to, using, and discussing confidential information, practices, and protocol of QBE." (*Id.* ¶ 8.) He reviewed hundreds of pages of confidential information — including corporate data, reserve practices, claim notes, file notes and strategy discussions about how to litigate Sandy cases — for QBE, had "numerous confidential and privileged communications with QBE representatives," and provided his opinion on insurance contract claims and other extra-contractual claims. (*Id.* ¶ 14.) He also participated in settlement discussions with "insureds and attorneys representing insureds" on behalf of QBE.[7] (*Id.* ¶ 15.) In addition to the discrete matters Mr. Pedro oversaw, he was "intimately involved in QBE's

---

lender-placed insurance policies, which are managed by QBE FIRST and use QBEAI as the third-party administrator. Although this somewhat clarified the relationship between the affiliate companies and QBE subsidiary companies, the nature of their overlap with one another is still unclear.

[6] Roberto's affidavit does not indicate to what extent Mr. Pedro actually performed any of these responsibilities, but simply indicates that his "primary responsibility" for each QBE file included such tasks. (Roberto Decl. ¶ 6.)

[7] Neither side specifies what role Mr. Pedro played in settlement discussions. In what is almost surely an unintentional oversight, Roberto's declaration states: "As part of these settlement discussions. . ." ellipses included, and has nothing further. (*Id.* ¶ 15.)

legal strategies," preparing legal documents like opinion letters, coverage analysis, and pleadings, recommending courses of action with regard to defending and prosecuting insurance claims, and resolving cases through settlement negotiations. (Roberto Decl. ¶ 9.)

There is no indication that Mr. Pedro ever represented Meritplan in any capacity, and he does not recall any such representation. (Pedro Aff. ¶¶ 12, 17.) Mr. Pedro claims that he did not receive any confidential information from Meritplan or any QBE entity that could be used by Plaintiffs against Meritplan in this action. (*Id.* ¶ 20.) He asserts that he did not review corporate business materials, confidential or proprietary information, company-wide claims handling positions, guidelines for policy interpretation, or internal documents from Meritplan or QBE entities, "with the exception of specific claim file materials relative to each individual claim." (*Id.* ¶ 21.) Relevant information in claim files typically included notice documents, insurance policy information, and occasionally included notes from claims representatives relating to the specific matter at issue. (*Id.* ¶ 22.) They did not include any uniform coverage strategy or particular interpretive positions adopted by the insurer. (*Id.*) Defendant conceded at oral argument that Mr. Pedro never worked on any Meritplan matters.

Approximately fourteen of Mr. Pedro's QBE matters involved claims related to Sandy, including twelve first-party property Sandy claims and two third-party liability claims. (Roberto Decl. ¶¶ 11, 17, 19.) Mr. Pedro recorded approximately 110 hours working on those fourteen matters, analyzing policy coverage, drafting coverage opinions, recommending coverage or denial of claims, and communicating with QBE on the matters. (*Id.* ¶¶ 11, 16, 19.) Sandy-related issues arose only in the approximately five months between the October 29, 2012 storm and Mr. Pedro's resignation from Goldberg Segalla on March 22, 2015. (Pedro Aff. ¶ 16.) The first-party property claims involved interpretation of insurance contracts that contained similar

language to the Insurance Policy at issue in the present action. (Roberto Decl. ¶ 16.) Four of the twelve matters involved water damage to the subject property. (*Id.* ¶ 18.) Mr. Pedro analyzed the insurance policies for each claim and drafted "proposed disclaimers which were reviewed by QBE and ultimately approved by QBE for issuance to the policyholders." (*Id.*) The disclaimers were then sent to the policyholders under Mr. Pedro's signature. (*Id.*) Roberto asserts that "the allegations made in this Complaint concerning Superstorm Sandy coverage are the same as those [for] which Mr. Pedro defended and counseled QBE." (*Id.* ¶ 21.) Specifically, Mr. Pedro's analysis concerned whether the loss to the subject properties was caused by wind-driven forces or by flood waters. (*Id.* ¶ 26.) The insurance policies in those cases were similar to the Insurance Policy in this action in that the policies were not likely to cover water damage due to flood waters. (*Id.* ¶ 26.)

In providing legal assistance on the Sandy-related matters, Mr. Pedro participated in internal Goldberg Segalla practice group meetings and other internal communications regarding Sandy-related emergency regulations, and was privy to general guidance that Goldberg Segalla provided to its institutional clients like QBE, including "Superstorm Sandy alerts" about "bad faith claims." (*Id.* ¶¶ 12–13; Pedro Aff. ¶ 24 (noting he attended monthly practice group meetings relating to Sandy in the four months following the storm).) He had access to QBE's documents which guide the handling of Sandy-related litigation like the instant action. (Roberto Decl. ¶ 14.) Roberto also asserts that Mr. Pedro "is now privy to the expert bank maintained, financial arrangements with independent adjusters and investigators, value placements, trial preparation practices and coverage assessments received for the exact same policy pending at issue." (*Id.*)

Mr. Pedro asserts that he does not recall any Sandy-related discussion with any insurance

representatives or managers at QBE. (Pedro Aff. ¶ 11.) He states his belief that any such discussions would have only occurred in the context of a particular insurance claim or assignment, thus relating only to the facts of the particular insurance claim at issue. (*Id.* ¶ 11.) Furthermore, Mr. Pedro asserts that he was not involved in any Sandy-related insurance *litigation* or settlement negotiations, and was instead only involved in preparing "pre-litigation responses," including claim response letters or reservation of rights letters sent directly to policyholders, for QBE, following the storm. (*Id.* ¶¶ 13, 17–18, 23.)

Mr. Pedro resigned from Goldberg Segalla on March 22, 2013. (Roberto Decl. ¶ 20; Pedro Aff. ¶ 4.) He has since joined EGB and assists in prosecuting the instant action. (Roberto Decl. ¶ 22.) Mr. Pedro asserts that he did not bring any client-related, confidential documents, files or materials from Goldberg Segalla to EGB. (Pedro Aff. ¶ 8.) None of Mr. Pedro's prior matters are being litigated by EGB. (*Id.*) Goldberg Segalla continues to represent QBE on Sandy-related claims. (Roberto Decl. ¶ 27.) Roberto asserts that at no point between leaving Goldberg Segalla and the present has either Mr. Pedro or EBG contacted QBE or requested QBE's consent to the representation of Plaintiffs against Meritplan. (*Id.* ¶ 23.)

Mr. Pedro asserts that when he resigned from Goldberg Segalla he advised the Managing Partner of the Princeton office — where Mr. Pedro worked — as well as "other partners and attorneys within the firm" that he was going to EGB and intended to represent insurance policyholders and other individuals impacted by Sandy. (Pedro Aff. ¶ 5.) Following his resignation, in the spring of 2013, Mr. Pedro spoke briefly with another partner from Goldberg Segalla's Buffalo office, who commented to Mr. Pedro that there was a conflict of interest arising from Mr. Pedro's representation of insurance policyholders against certain insurers. (*Id.* ¶ 6.) Mr. Pedro later had a telephone conversation with that partner and another with Sharon

Angelino, chairperson of the Global Insurance Services practice group at Goldberg Segalla, in which Mr. Pedro was advised that QBE would require a conflict waiver before it would settle any current litigation. (*Id.* ¶ 6.) EGB disagreed that Mr. Pedro's representation of the policyholders constituted a conflict of interest. (*Id.*)

On January 23, 2014 and August 4, 2014, Goldberg Segalla sent letters to Mr. Pedro inquiring about the potential conflict and requesting that Mr. Pedro respond; neither Mr. Pedro nor EBG responded. (Roberto Decl. ¶¶ 24, 25; Letters dated January 23, 2014 and August 4, 2014 from Sharon Angelino at Goldberg Segalla to Verne Pedro at Ellis, Ged & Bodden, annexed to Roberto Decl. as Ex. 1, at 1–2.) The January 23, 2014 letter indicates that Goldberg Segalla believed it was inappropriate for Mr. Pedro to be involved in litigation "against Goldberg Segalla's insurer clients regarding Superstorm Sandy claims" due to his previous work at the firm. (Letter dated January 23, 2014, annexed to Robert Decl. as Ex. 1 at 1.) The August 4, 2014 letter indicates that the firm believed litigation against QBE Specialty Insurance required a conflict waiver. (Letter dated August 4, 2014, annexed to Robert Decl. as Ex. 1 at 2.) No waiver has been executed to date.

## II. Discussion

### a. Standard of Review

The Court's authority to disqualify attorneys stems from its "inherent power to preserve the integrity of the adversary process." *Hempstead Video, Inc. v. Inc. Vill. of Valley Stream*, 409 F.3d 127, 132 (2d Cir. 2005) (internal quotation marks omitted). The ultimate decision of whether to disqualify an attorney is within the sound discretion of the court, and requires balancing the "client's right to select counsel of his choice against the need to maintain the integrity and high standards of the legal profession." *Nordwind v. Rowland*, 584 F.3d 420, 435

(2d Cir. 2009); *see Pierce & Weiss, LLP v. Subrogation Partners LLC*, 701 F. Supp. 2d 245, 249

(E.D.N.Y. 2010) ("[T]he determination of disqualification is discretionary in nature." (citing

*Hull v. Celanese Corp.*, 513 F.2d 568, 571 (2d Cir. 1975))). "It is well established that courts in

the Second Circuit approach motions for disqualification with fairly strict scrutiny and that they

are generally disfavored" as such motions are often interposed for tactical reasons. *Pierce &*

*Weiss*, 701 F. Supp. 2d at 250 (internal quotation marks omitted); *Gabayzadeh v. Taylor*, 639 F.

Supp. 2d 298, 300 (E.D.N.Y. 2009); *see also Murray v. Metro. Life Ins. Co.*, 583 F.3d 173, 178

(2d Cir. 2009) ("Because courts must guard against the tactical use of motions to disqualify

counsel, they are subject to fairly strict scrutiny . . . ."). While the burden required to merit

disqualification is a high one, the Second Circuit has cautioned that "any doubt is to be resolved

in favor of disqualification." *Hull*, 513 F.2d at 571; *see also Maricultura Del Norte, S. de R.L.*

*de C.V. v. Worldbusiness Capital, Inc.*, No. 14-CV-10143, 2015 WL 1062167, at *7 (S.D.N.Y.

Mar. 9, 2015); *Gabayzadeh*, 639 F. Supp. 2d at 298 (citing *Cheng v. GAF Corp.*, 631 F.2d 1052,

1059 (2d Cir. 1980) *vacated on other grounds and remanded*, 450 U.S. 903 (1981)).

The disciplinary rules governing lawyers in New York, or the standards set by the

American Bar Association ("ABA"), may inform the Court's analysis of a motion to disqualify.

*Nordwind*, 584 F.3d at 435 (citing *Hempstead Video*, 409 F.3d at 132); *see New York v. Monfort*

*Trust*, No. 12-CV-3755, 2014 WL 5018607, at *3 (E.D.N.Y. Oct. 7, 2014) (noting that New

York's new rules are "substantively similar to old rules," such that precedent interpreting the

other rules is still applicable (quoting *Pierce & Weiss*, 701 F. Supp. 2d at 251)); *see also* Local

Rules of the United States District Courts for the Southern and Eastern Districts of New York R.

1.3 (noting lawyers must be familiar with the New York Rules of Professional Conduct prior to

admission to the bar in the Eastern District of New York). However, "not every violation of a

[state or ABA] disciplinary rule will necessarily lead to disqualification," as disqualification is only warranted where "an attorney's conduct tends to taint the underlying trial." *Hempstead Video*, 409 F.3d at 132 (citing *Bd. of Educ. v. Nyquist*, 590 F.3d 1241, 1246 (2d Cir. 1979)) (noting other ethical violations can be left to federal and state disciplinary mechanisms); *see GSI Commerce Solutions, Inc. v. Babycenter, LLC*, 618 F.3d 204, 209 (2d Cir. 2010) (Attorney's "disqualification is warranted only if an attorney's conduct tends to taint the underlying trial." (internal quotation marks omitted)); *United States v. Quest Diagnostics Inc.*, 734 F.3d 154, 166–67 (2d Cir. 2013) ("Not all violations of the legal code of ethics require dismissal or disqualification of counsel, . . . the relevant inquiry [is] the possibility of prejudice at trial." (internal quotation marks omitted)); *Glueck v. Jonathan Logan, Inc.*, 653 F.2d 746, 748 (2d Cir. 1981) ("Recognizing the serious impact of attorney disqualification on the client's right to select counsel of his choice, we have indicated that such relief should ordinarily be granted only when a violation of the Canons of the Code of Professional Responsibility poses a significant risk of trial taint."); *see also HLP Properties, LLC v. Consol. Editson Co. of N.Y.*, No. 14-CV-01383, 2014 WL 5285926, at *3 (S.D.N.Y. Oct. 16, 2014) (noting that the "only truly binding authority on disqualification issues is the Second Circuit" (internal quotation marks omitted)).

Additionally, an attorney's former-client conflicts may be imputed to his current firm based on the presumption of shared confidences within the firm, which presents the same opportunity to use confidential information against a former client. *Hempstead Video*, 409 F.3d at 133; *see also* N.Y. R. Prof'l Conduct 1.10. That presumption may be rebutted either with evidence of an ethical screen or evidence of *de facto* separation that would effectively prevent the attorney from tainting the underlying trial. *Hempstead Video*, 409 F.3d at 138.

### b. Mr. Pedro is not disqualified

In sum, Defendant argues that Mr. Pedro's representation of Plaintiffs in this action "constitutes a direct and unsurpassable ethical conflict of interest with Mr. Pedro's former client, QBE Insurance Company and QBE affiliates and subsidiaries." (Def. Mem. 1.) Plaintiffs do not dispute that Mr. Pedro represented QBE, but assert that disqualification is not warranted because Mr. Pedro did not represent Defendant, and ultimately did not acquire confidential information which could be used against Defendant in this action.[8] (Pl. Opp'n Mem. 10.)

Disqualification of an individual attorney is typically ordered only in cases where an attorney's conduct tends to taint the underlying trial, which may arise: "(1) where an attorney's conflict of interests undermines the court's confidence in the vigor of the attorney's representation of his client, or more commonly (2) where the attorney is at least potentially in a position to use privileged information concerning the other side through prior representation." *HLP Properties*, 2014 WL 5285926, at *3 (internal quotation marks and alteration omitted) (quoting *Bobal v. Rensselaer Polytechnic Inst.*, 916 F.3d 759, 764–65 (2d. Cir. 1990)); *U.S. Football League v. Nat'l Football League*, 605 F. Supp. 1448, 1452 (S.D.N.Y. 1985) (same, noting that the first circumstance arises from concurrent conflicts, and the second involves arises from successive representation). The balance required to sustain a motion for disqualification

---

[8] Plaintiffs also argue that Defendant waived the right to seek disqualification by delaying in filing its motion until approximately one year after the Complaint was filed. (Pl. Opp'n Mem. 20–21.) However, the record shows that Goldberg Segalla has been in contact with Mr. Pedro regarding the alleged conflict with various QBE entities since at least January of 2014, within three months of the filing of this action. (*See* Letters annexed to Roberto Decl. as Ex. 1; Pedro Aff. ¶ 6.) Furthermore, the instant action has been consolidated with a number of other actions in the Eastern District of New York for coordinated pretrial proceedings, and did not progress substantially between the date the Complaint was filed and the date Defendant initially informed the Court it would seek to disqualify Plaintiffs' counsel. Thus, the Court finds that Defendant did not waive the right to make this motion, and will consider it on the merits.

varies based on the type of conflict present; while "concurrent representation is *prima facie* improper," *see GSI Commerce Solutions*, 618 F.3d at 209, a three-part balancing test applies when considering a motion to disqualify based on successive representation, *Hempstead Video*, 409 F.3d at 133.

In the Second Circuit, an attorney who seeks to represent a current client against a former client may be disqualified if:

> (1) the moving party is a former client of the adverse party's counsel; (2) there is a substantial relationship between the subject matter of the counsel's prior representation of the moving party and the issues in the present lawsuit; and (3) the attorney whose disqualification is sought had access to, or was likely to have had access to, relevant privileged information in the course of his prior representation of the client.

*Nordwind*, 584 F.3d at 435 (citing *Hempstead Video*, 409 F.3d at 133); *Monfort Trust*, 2014 WL 5018607, at *3 (same); *DeFazio v. Wallis*, 459 F. Supp. 2d 159, 163–64 (E.D.N.Y. 2006) (same); *see also* N.Y. R. Prof'l Conduct 1.9 (duties to former clients). The test focuses on identifying situations in which there exists the *potential* that confidential information obtained during representation of an adverse party could be used in the present action. *See Hempstead Video*, 409 F.3d at 133 ("One recognized form of taint arises when an attorney places himself in a position where he could use a client's privileged information against that client."); *Glueck*, 653 F.2d at 748 (The risk of trial taint is present, and thus disqualification is warranted, when an attorney has the opportunity to benefit one client by "using confidential information about an adverse party obtain through prior representation of that party . . . ."); *Pergament v. Ladak*, No. 11-CV-2797, 2013 WL 3810188, at *3 (E.D.N.Y. July 23, 2013) ("The central concern underlying disqualification based on successive representation is the possibility 'however slight, that confidential information acquired from a client during a previous relationship may subsequently be used to the client's disadvantage.'" (citation omitted)).

### i.    Former client of adverse party's counsel

The preliminary question is whether Defendant is a former client of Mr. Pedro.  Both parties agree that Mr. Pedro, as counsel at Goldberg Segalla, did not represent Defendant directly.  Defendant contends that because Mr. Pedro performed services for QBE-related entities at Goldberg Segalla, he should be disqualified from opposing Defendant Meritplan by virtue of the corporate affiliation of Meritplan and QBE entities.  (Def. Mem. 10–11.)  Plaintiffs concede that Mr. Pedro performed some legal services for QBE entities including QBE Specialty Insurance, (Pedro Aff. ¶ 14), but contend that Defendant was not Mr. Pedro's client, and that the QBE entities and Defendant should not be deemed a single entity for conflict purposes.  (Pl. Opp'n Mem. 12–13.)  Plaintiffs further contend that even if Mr. Pedro did provide legal services to Defendant, as an affiliate of the QBE entities, Mr. Pedro did not acquire confidential information that could be used to the detriment of Defendant in this action.  (*Id.* at 14.)

"[A] 'lawyer who represents a corporation or other organization does not, by virtue of that representation, necessarily represent any constituent or affiliated organization, such as a parent or subsidiary.'"  *GSI Commerce Solutions*, 618 F.3d at 210 (quoting ABA Model R. of Prof'l Conduct 1.7 cmt. 34 (2006)); N.Y. R. Prof'l Conduct 1.7, cmt. 34 (same); *see also* N.Y. R. Prof'l Conduct 1.13(a).  Still, "representation adverse to a client's affiliate can, in certain circumstances, conflict with the lawyer's duty of loyalty owed to a client . . . ."  *GSI Commerce Solutions*, 618 F.3d at 210 (analyzing duty of loyalty in concurrent conflict context).  Whether concurrent representation of affiliated entities may give rise to a conflict of interest depends on "(i) the degree of operational commonality between affiliated entities, and (ii) the extent to which one depends financially on the other."  *Id.*; *see also HLP Properties*, 2014 WL 5285926, at *5 (same).  Under the New York Rules of Professional Conduct, "[w]hether the affiliate

should be considered a client of the lawyer may also depend on (i) whether the affiliate has imparted confidential information to the lawyer in furtherance of the representation, (ii) whether the affiliated entities share a legal department and general counsel, and (iii) other factors relating to the legitimate expectations of the client as to whether the lawyers also represents the affiliate." N.Y. R. Prof'l Conduct 1.7, cmt. 34.

Defendant has established that its corporate relationship with QBEAI and QBE FIRST shows some degree of operational commonality, particularly to the extent that QBEAI and QBE FIRST manage Defendant's insurance policies and thus are involved in the current action. Defendant asserts that "QBE acts as Meritplan's accounting, audit, cash management, employee benefits, finance, human resource, information technology, insurance, payroll, and travels service and system" for Meritplan's property and casualty insurance businesses.[9] (Def. Mem. 10–11.) *See HLP Properties*, 2014 WL 5285926, at *5 (finding operational commonalities exist when companies "share corporate headquarters, a computer system, a payroll system, a human resources department, benefits plans and their law department," had six officers in common, and when the subsidiary "represents 84% of its operating revenues, 96% of its net income and 89% of its assets"); *JPMorgan Chase Bank v. Liberty Mutual Ins. Co.*, 189 F. Supp. 2d 20, 23 (S.D.N.Y. 2002) (finding holding company and insurer the same client for purposes of analyzing concurrent conflict of interest, as subsidiary accounted for 90% of holding company's business, and the companies shared identical headquarters, board, and general counsel). *But cf. N.Y.*

---

[9] Counsel cites no evidence for this assertion and does not clarify to which QBE entities it refers. At oral argument, counsel asserted that the policies issued by various QBE entities, including Meritplan, QBE Insurance Corp., Stonington, and Lantana, are all managed by QBEAI and QBE FIRST. Counsel argued that the people with whom Mr. Pedro interacted, in representing QBE, are the same people who would handle Meritplan's "force-placed" lender insurance policy claims.

*Marine & Gen. Ins. Co. v. Tradeline (L.L.C.)*, 186 F.R.D. 317, 320 (S.D.N.Y. 1999) (finding the fact that plaintiff insurance company paid some percentage of legal fees, was copied on correspondence, and attended some meetings with defendant's former counsel and lead underwriter in insurance matter was insufficient, standing alone, to show plaintiff was vicarious client of counsel). The core inquiry in determining whether affiliated entities should be considered "clients" of an attorney is, considering the risks against which the ethics rules are designed to guard, whether those risks are actually present in this factual circumstance. *See Glueck*, 653 F.2d at 749 (finding that member of trade association and trade association itself are not same client for purposes of concurrent adverse representation, noting that "when an adverse party is only a vicarious client by virtue of member in an association, the risks against which [the ethics rule,] Canon 5 guards will not inevitably arise"); *see also Allegaert v. Perot*, 565 F.2d 246, 250 (2d Cir. 1977) ("[B]efore the substantial relationship test is even implicated, it must be shown that the attorney was in a position where he could have received information which his former client might reasonably have assumed the attorney would withhold from his present client."); *Monfort Trust*, 2014 WL 5018607, at *3 ("A legitimate disqualification issue arises in cases 'when an attorney places himself in a position where he could use a client's privileged information against that client.'" (quoting *Hempstead Video*, 409 F.3d at 133)). The purpose of the bar on successive representation is to prevent an attorney from using confidences gained in the former representation to the disadvantage of the client in the later representation. *U.S. Football League*, 605 F. Supp. at 1452.

Here, operational overlap does not present the same risks that it would in an action involving concurrent representation, like those at issue in *GSI Commerce Solutions*, *HLP Properties*, and *JPMorgan Chase Bank*. *See N.Y. Marine*, 186 F.R.D. at 320 (noting that when

former-client relationship depends on affiliation with traditional client, a court must inquire as to

a substantial relationship between the matters, meaning asking whether "the attorney might have

acquired information related to the subject matter of the subsequent representation" (quoting *T.C.*

*Theatre Corp. v. Warner Bros. Pictures*, 113 F. Supp. 265, 269 (S.D.N.Y. 1995)).  Furthermore,

Defendant does not assert that Mr. Pedro directly performed work for QBEAI or QBE FIRST,

and instead relies on a more attenuated relationship between the QBE entities that Mr. Pedro *did*

represent, those QBE entities directly involved with Defendant, and Defendant itself.[10]

Disqualification on this basis, without some further showing that Mr. Pedro is at risk of

disclosing or using Defendant's confidences against Defendant in this action, would be troubling.

There is no indication here that Defendant was in any way involved in or related to the matters

on which Mr. Pedro represented QBE affiliates.  It is difficult to conclude, on these facts alone,

that Mr. Pedro did have access to confidential information from *Defendant* that Defendant would

---

[10]  Defendant points to cases outside this Circuit that address the relationship between QBE Insurance Corporation, QBE Holdings, Incorporated and other QBE affiliates.  *See Alvarez v. QBE Ins. Corp.*, No. 14-CV-117, 2015 WL 389496, at *4 (D.N.J. Jan. 28, 2015) (finding QBE Insurance Corporation and Balboa Insurance Company, an affiliate, shared an "identity of interest" for purposes of Rule 15(c)(3) of the Federal Rules of Civil Procedure); *Decambaliza v. QBE Holdings, Inc.*, No. 13-CV-286, 2013 WL 5777294, at *1 (W.D. Wis. Oct. 25, 2013) ("Defendant QBE Insurance Corporation is a subsidiary of defendant QBE Holdings, Inc. and writes force-placed insurance for hazard and flood coverage throughout the United States, including the state of Wisconsin.  Defendant QBE Financial Institutional Risk Services, Inc. (QBE First), another subsidiary of QBE Holdings, tracks and monitors portfolios and manages the placement of force-placed insurance for QBE Insurance Corporation.  (QBE First was known as ZC Sterling Corporation until February 2010 and then as Sterling National Corporation until April 2011.)  QBE Holdings acquired QBE First in December 2008.  On June 1, 2011, QBE Holdings purchased Balboa [Insurance Company]'s assets from Bank of America Corporation, including Balboa's employees, facilities, and its subsidiary, Newport Management.  Although Bank of America Corporation retained Meritplan [Insurance Company], the QBE defendants manage all of Balboa's force-placed business, receive Balboa's premiums and assume the risk of Balboa's force-placed insurance.")  None of these cases explains the relationship between the QBE entities and Defendant, or why that relationship warrants treating Defendant as Mr. Pedro's former-client.

have expected Mr. Pedro to withhold from Plaintiffs in the instant action. However — despite the lack of clarity from both parties as to the relationship between the QBE entities Mr. Pedro represented and Meritplan — it is apparent that there is some degree of coordination between QBE entities and Defendant regarding legal strategies and legal consultations. (*See* Supp. Davidson Decl. ¶¶ 7–8.) Thus, for the purposes of this Memorandum and Order, the Court will assume a significant relationship exists between the parties, for conflicts purposes, and will address whether there is a substantial relationship between Mr. Pedro's prior representation of QBE and the subject matter at issue in this case. *See N.Y. Marine*, 186 F.R.D. at 320 (noting that when former-client relationship depends on affiliation with traditional client, the court's analysis requires inquiry into substantial relationship between the matters).

### ii. Substantial relationship between prior representation and present suit

Even assuming that Mr. Pedro can be fairly said to have represented Defendant in the past,[11] disqualification will be warranted only if Mr. Pedro advised Defendant on matters substantially related to Plaintiffs' claim in this suit. Defendant argues that Mr. Pedro's work for QBE relating to first-party property damage insurance claims, arising out of Sandy, is substantially related to the issues raised in this action.[12] (Def. Mem. 11.) Defendant further argues that Mr. Pedro's analysis of coverage for the Sandy-related insurance claims "provides

---

[11] That is, that Mr. Pedro's representation of QBE created an attorney-client relationship with Meritplan by virtue of the affiliate relationship.

[12] Defendant relies on a similar motion its counsel made in *Leone v. Stonington Insurance, Ltd.*, an action filed in the District of New Jersey under docket number 14-CV-695, seeking to disqualify Mr. Pedro from representing the plaintiffs in that action against Stonington Insurance, Ltd., another QBE-affiliate insurance underwriter. In that action, the plaintiffs ultimately filed a stipulation substituting new counsel for Mr. Pedro and EGB. The motion to disqualify was dismissed as moot. Defendant appears to imply that there is some special significance attached to the plaintiffs' decision to obtain new counsel. (Def. Supp. Mem. in Supp. of Mot. to Disqualify 2–3.) The Court finds none.

him with unique insight into QBE's confidences, strategies, procedures, and approach to first-party property claims . . . that Mr. Pedro could now use against Meritplan." (Def. Mem. 15.) Plaintiffs argue that Defendant has not met its burden to show the factual issues are substantially related, that the connections to insurance law and property damage arising out of Sandy are only "broad and fundamental legal concepts that apply wholesale to every [] Sandy case," and that Mr. Pedro has no special inside knowledge relevant to the specific contract, and breach thereof, at issue in this litigation. (Pl. Opp'n Mem. 15–17.)

In considering a disqualification motion, the substantial relationship "prong [of the test] is established 'only upon a showing that the relationship between issues in the prior and present cases is patently clear. Put more specifically, disqualification has been granted or approved recently only when the issues involved have been identical or essentially the same.'" *Revise Clothing, Inc. v. Joe's Jeans Subsidiary, Inc.*, 687 F. Supp. 2d 381, 392 (S.D.N.Y. 2010) (internal quotation marks omitted) (quoting *Gov't of India v. Cook Indus., Inc.*, 569 F.2d 737, 739–40 (2d Cir. 1978)). The inquiry does not turn on whether the legal claims or underlying theories are similar, but rather whether the successive representations share common material factual issues. *Id.*; *see also Monfort Trust*, 2014 WL 5018607, at *5 ("Put differently, a substantial relationship exists when the material facts of the prior representation are necessary to the present litigation." (internal quotation marks, alteration and citation omitted)); *Leslie Dick Worldwide, Ltd. v. Soros*, No. 08-CV-7900, 2009 WL 2190207, at *9 (S.D.N.Y. July 22, 2009) (noting that the inquiry depends on material common factual issues, which are practically the same in both actions); *U.S. Football League*, 605 F. Supp. at 1460 n.26 ("It is the congruence of *factual* matters, rather than areas of law, that establishes a substantial relationship between representations for disqualification purposes."). Under the New York Rules of Professional

Conduct, matters are "substantially related" if "they involve the same transaction or legal dispute or if, under the circumstances, a reasonable lawyer would conclude that there is otherwise a substantial risk that confidential factual information that would normally have been obtained in the prior representation would materially advance the client's position in the subsequent matter." N.Y. R. Prof'l Conduct 1.9, cmt. 3. Thus, the matters must be substantially related on the facts, and not just similar in type.

Typically, showing that an attorney only provided general representation to the former client, that gave the attorney insight into or access to litigation strategies or similar information, is insufficient to establish a substantial relationship between the former representation and the present matter. *See Revise Clothing*, 687 F. Supp. 2d at 393–94 (finding that access to "strategic thinking" or "litigation thinking" is insufficient, standing alone, to warrant disqualification); *Scantek Med., Inc. v. Sabella*, 693 F. Supp. 2d 235, 240 (S.D.N.Y. 2008) ("Where the only allegation of similarity is the attorney's alleged insight into the former client's 'general litigation thinking,' similarity is not established."); *Hickman v. Burlington Bio-Med. Corp.*, 371 F. Supp. 2d 225, 230 (E.D.N.Y. 2005) (general litigation thinking is not sufficient to establish similarity). However, disqualification may be warranted in rare cases where an attorney had extensive access to and insight into the client's strategies on issues of a similar subject matter to the legal issues in question, occasionally termed knowledge of the client's "playbook." *See In re I Successor Corp.*, 321 B.R. 640, 658–59 (Bankr. S.D.N.Y. 2005) ("[D]isqualification may be appropriate when the two matters are merely similar when 'disqualification is predicated on the extensiveness of the attorney's exposure during the prior representation to particular practices that are similar to those underlying the subsequent litigation.'" (quoting *Bennett Silvershein Assoc. v. Furman*, 776 F. Supp. 800, 804 (S.D.N.Y.1991))); *Mitchell v. Metropolitan Life Ins. Co., Inc.*, No. 01-CV-2112,

2002 WL 441194, at *4 (S.D.N.Y. Mar. 21, 2002) (noting that the rule against using client confidences is designed to protect against unfair advantage gained when lawyer knows what to ask for in discovery, what witnesses to question, and similar information); *Ullrich v. Hearst Corp.*, 809 F. Supp. 229, 238 (S.D.N.Y. 1992) (concluding attorney with extensive experience representing defendant on similar issues, who also likely had information pertaining to the intentions of defendant's executives, was disqualified because of substantial background knowledge).  Furthermore, if the legal claims call into question the client's confidential background information to which a lawyer had access, even general representation might be deemed "substantially related" to the legal claims.  *Scantek Med.*, 693 F. Supp. 2d at 239–40 (quoting *Hickman*, 371 F. Supp. 2d at 230); *Ullrich*, 809 F. Supp. at 238; *U.S. Football League*, 605 F. Supp. at 1460.

At issue in this litigation is whether wind or wind-driven rain, as opposed to flooding, caused damage to the Property, and whether Defendant breached the Insurance Policy when it made the determination that the damage was not covered.  The facts in this action relate to Plaintiffs' property and Plaintiffs' Insurance Policy, which were not at issue in Mr. Pedro's prior representation of QBE.  While Plaintiffs' Insurance Policy was issued during the time period Mr. Pedro worked for Goldberg Segalla, there is no indication that he negotiated that contract, reviewed it, or was even aware of it.  *Cf. AVRA Surgical, Inc. v. Dualis MedTech GmbH*, No. 13-CV-7863, 2014 WL 2198598, at *2 (S.D.N.Y. May 27, 2014) (finding counsel cannot represent plaintiff against defendant because counsel represented defendant in negotiating the agreement that was the subject of the lawsuit).  Thus, the instant action is not the "same" as those involved in Mr. Pedro's previous representation of QBE entities, and the Court must inquire as to whether the actions are similar enough to meet the standard.

Admittedly, the fact that Sandy caused rain, wind, and flooding is a common issue in this action and other first-party insurance claims on which Mr. Pedro advised QBE affiliates. That the matters were "Sandy-related," however, does not make them *substantially* related, in the sense that they are essentially the same, because the material facts at issue are (1) the cause of damage to the Property, and (2) the terms of the Insurance Policy. There is no evidence that Mr. Pedro handled any case involving even similar questions of fact. *See Leslie Dick Worldwide*, 2008 WL 2190207, at *9–10 (finding relationship between prior state court action and current action, concerning fraudulent representations surrounding the auction of the GM building in 2003, arose from the same underlying events and involved many of the same parties, but finding that relationship was not substantial because the actions did not involve identical or even similar questions of fact material to both representations); *cf. Cablevision Lightpath, Inc. v. Verizon N.Y. Inc.*, No. 11-CV-2457, 2011 WL 3845504, at *3 (E.D.N.Y. Aug. 30, 2011) (finding substantial relationship between current and former representation when client sought advice "concerning the applicability of federal access charges to VoIP traffic and the relevant regulatory framework" on five occasions, and counsel litigated the same issue in earlier federal action, where plaintiffs sued defendants for failing to make access charge payments "on the grounds that access charges do not apply to traffic originating or terminating in VoIP format" noting that "in both the prior representation and the current suit, the core issue is whether access charges are applicable to VoIP traffic"); *Decora, Inc. v. DW Wallcovering, Inc.*, 899 F. Supp. 132, 138 (S.D.N.Y. 1995) (finding substantial relationship because validity of specific patent directly at issue in both cases).

Furthermore, that Mr. Pedro had access to other insurance policies that were similar in kind, participated in discussions with QBE affiliates, and participated in internal firm meetings

regarding insurance matters does not tip the scales in favor of finding that the matters are substantially related. The logical conclusion of Defendant's argument would preclude Mr. Pedro from ever appearing in an insurance-related action against any QBE affiliate, regardless of whether Mr. Pedro had acquired relevant confidential information. *See Emp'rs Ins. Co. of Wausau v. Munich Reins. Am., Inc.*, No. 10-CV-3558, 2011 WL 1873123, at *6 (S.D.N.Y. May 16, 2011) (noting that argument to disqualify counsel on reinsurance arbitration because counsel would know former client's preferences from prior representation "proves too much" as its "logical extension would mean that a lawyer's representation of a client in a reinsurance arbitration in the recent past would foreclose that lawyer from representing a party adverse to the former client in a subsequent arbitration," incentivizing powerful defendants to spread representations across the field of reinsurance law in order to manufacture conflicts).

Nor do the facts presented here rise to the level of "playbook" knowledge at issue in *Ullrich v. Hearst Corp.*, as Defendants urge the Court to conclude. *See Ullrich*, 809 F. Supp. 229. In *Ullrich*, an attorney who represented the defendant for more than twenty years as both in-house and outside counsel on labor and employment issues brought an action, on behalf of the plaintiffs, for employment discrimination and unlawful discharge against the defendant. *Id.* at 231–32. The court concluded that the attorney's "lengthy and extensive prior experience" advising the defendant on similar questions "has given him extensive access to confidential information pertaining to" how the plaintiff-employees would have been evaluated in their employment. *Id.* at 235. The court went on to note that the litigation raised "the question whether [defendant's] management has harbored such discriminatory sentiments in the recent past," information the attorney may have had access to in his conversations with executives during his extensive representation of defendant. *Id.* Thus, the court concluded that the

attorney's representation of plaintiffs against defendant "in matters closely related to the subject of his former representation of [defendant] raises a clear likelihood of misuse of confidences entrusted to him by [defendant] in the attorney-client relationship," that the matters were substantially related, and that the attorney should be disqualified. *Id.* at 238.

Here, where Mr. Pedro did not represent Defendant but Defendant's affiliate(s), represented that affiliate (or those affiliates) for a short period of time, performed legal services that were limited in scope, and ultimately has not been shown to have access to any of Defendant's confidential information beyond possibility interacting with members of Defendant's litigation team on other matters, there is no "playbook" knowledge that would warrant his disqualification in this matter. *See Emp'rs Ins. Co. of Wausau*, 2011 WL 1873123, at *7 (noting that case was different from *Ullrich* because "far more than general litigation thinking was acquired; the attorney [in *Ullrich*] had acquired extensive confidential information about the former client's business practices relating to employment and discharge"); *Battagliola v. Nat'l Life Ins. Co.*, No. 03-CV-8558, 2005 WL 101353, at *1–4 (S.D.N.Y. 2005) (noting disqualified plaintiff's counsel had recorded more than 9600 hours of billable time providing legal services to defendant and defendant's parent company, worked close with the parent company's in-house counsel, was privy to legal extranet system and had access to confidential information from meetings); *Mitchell*, 2002 WL 441194, at *5–6 (contrasting case where a lawyer previously assisted a client in settlement discussions in a small number of cases with "prolonged and extensive prior representations of the company" noting that the latter permitted the lawyer to obtain confidential information relating to suits of the same nature, and thus the latter supported finding of substantial relationship on "playbook" theory). Here, there is no evidence in the record that Mr. Pedro had any confidential information that was relevant to or materially related

to the breach of contract claim at issue in this action.[13] Defendant strenuously argues that the

corporate relationship between the QBE affiliates requires the Court to conclude that Mr. Pedro

had access to similar relevant information from Meritplan because of shared litigation teams and

strategies. However, the Court concludes that Defendant has failed to establish that Mr. Pedro

was likely to have access to Defendant's relevant privileged information in the course of his

representation of QBE at Goldberg Segalla, and thus failed to meet the high burden required to

warrant the drastic remedy of disqualification.

---

[13] Defendant relies on a decision originating from five actions in the Superior Court of the state of New Jersey, in which Mr. Pedro was disqualified from representing plaintiffs in actions against QBE Specialty Insurance Company and Scottsdale Insurance Company, another QBE affiliate. (Def. Supp. Brief in Supp. of Mot. to Disqualify 5; *Morrone v. Scottsdale Ins. Co.*, No. OCN-L-3710-13 et al. (Sup. Ct. N.J. Dec. 22, 2014), Docket Entry No. 98-1.) Judge Robert A. Fall determined that Mr. Pedro represented Scottsdale Insurance Company ("Scottsdale") and QBE Specialty Insurance Company ("QBE Specialty") directly, and communicated directly with both companies. (*Id.* at ECF No. 5–6.) Judge Fall concluded that the plaintiffs' claims of bad faith were substantially related to the work that Mr. Pedro performed for Scottsdale and QBE Specialty because those claims put at issue confidential information to which Mr. Pedro had access as part of his representation of QBE Specialty Insurance Company, including "confidential, work-product information concerning how Scottsdale and QBE should respond to and process claims, some specifically as to Superstorm Sandy claims." (*Id.* at ECF No. 26–27.) *See also Gov't of India v. Cook Indus., Inc.*, 569 F.2d 737, 738–40 (2d Cir. 1978) (disqualifying counsel who had defended defendant in matters questioning defendant's shipments of soybeans, alleged to be fraudulently short of the weight stated on bills of lading, which counsel subsequently represented plaintiff in a new action, brought by different plaintiffs, on exact same claims, because the new claim implicated "confidential inquiries as to [defendant's] loading procedures"); *Battagliola v. Nat'l Life Ins. Co.*, No. 03-CV-8558, 2005 WL 101353, at *10 (S.D.N.Y. 2005) (noting that the attorney in *Gov't of India* was disqualified "even though the actions involved different shipments, of different products, at different times, to different recipients" because the same issue of "whether [defendant] issued false bills of lading" was present in former and current actions).

While not irrelevant to the breach of contract claim, the information to which Mr. Pedro may have had access is less important in a straightforward breach of contract action where any bad intentions or background of Defendant is not at issue. Here, there is no dispute that Mr. Pedro never worked on any Meritplan-issued insurance policy or performed any work for Meritplan. Thus, Defendant is, in effect, alleging that Mr. Pedro was privy to QBE's and Goldberg Segalla's general litigation thinking, which does not satisfy the high burden to show entitlement to disqualification.

    **c.    EGB is not disqualified**

As Defendant has failed to meet its burden to show that disqualification is warranted in this action as to Mr. Pedro, the Court also denies Defendant's motion to disqualify EGB.

**III.  Conclusion**

For the foregoing reasons, the Court denied, at oral argument, Defendant's motion to disqualify Plaintiffs' counsel.

             SO ORDERED:


             _____s/ MKB_____
             MARGO K. BRODIE
             United States District Judge

Dated: July 30, 2015
       Brooklyn, New York